The case for argument is number 20-3679 Thorpe v. Duve. We'll hear first from the appellant, Mr. Hoffman. Are you there? I see you but can't hear you. There you are. Are you on mute. Mr. Hoffman, I believe you're muted. There you go. How are we? Am I okay? Yeah, why don't you start. Thank you. May it please the court, Andrew L. Hoffman for appellants Michael Thorpe and Michael Durand. Looking at the evidence in this case as a whole, it is plain that the defendants were determined to make a case against Michael Thorpe and Michael Durand one way or another. And that in order to do so, they made Victor Gardner, a career felon, drug addict, potential suspect in the crime, and known con man who was facing 84 years in prison for an unrelated burglary, their star witness. Rather than seek to corroborate Gardner's tale as any reasonable law enforcement officer would have, defendants consistently refrained from doing so, most notably, making no effort to investigate Mike Lalonde, who Gardner claimed to have been with him every step of the way on the night of the murder. Instead, they fabricated evidence to link Michael Thorpe to a series of incriminating phone calls and began a months-long pressure campaign against non-party witness Samantha Mayshaw in an effort to get her to corroborate a portion of Gardner's narrative. This campaign included entering her home without permission or authority and threatening to charge her with murder if she did not provide that with certain information that she did not have. This culminated in defendant detective Harry McCarthy, who is currently serving 15 years in federal prison on an unrelated felony, showing Mayshaw a copy of Gardner's statement and feeding her details of the narrative they wanted her to regurgitate. Aside from the fact that there's apparently some controversy as to whether she said that, she wasn't testifying. She wasn't under oath. She was giving a summary of what she believed the evidence showed. I think it's our position that it was unsworn testimony. She was vouching for what was in that report, what the findings were. And she took off her prosecutorial hat and she put on a complaining witness hat. Metaphorically, I take it. Yes, Your Honor. Could I ask you about this testimony from Ms. Mayshaw? And I understand all of the reasons why you described the campaign to get her testimony as unduly coercive. In the other cases in which that's become a factor in rebutting the presumption of probable cause, the witness whose testimony has been relied upon that was coerced has since disavowed that testimony. And I'm trying to figure out what to do with the fact that if we agree with you that this was a sort of coercive campaign to get her to say what they wanted her to say, but she's still sticking to it. How can we conclude that that was false and coerced testimony without essentially deciding the merits of the case? Like what really happened? Yes, I... Number one, Samantha Mayshaw did disavow what she testified to. What she testified to at grand jury was that she picked up Tony Lalonde and his two friends who had the same name. At deposition, she said that officers were pressuring her at the threat of a murder charge to give them information she did not have. Also, she said she didn't know the people that were the friends. And by the time she gets to grand jury, she's identifying them as having the same name. And by the time she gets to trial, they're both Mike. So, in a sense, she does disavow what she had testified to. It should also be pointed out that she wouldn't testify in this civil case unless she had an attorney. She was terrified. In fact, we had to abort the first attempt to depose her. She was in a peculiar position where she could, if this was a straightforward truth, she could just repeat the story that she had at trial and got immunity for. But if she did that, she would risk perjuring herself in the civil case. And I think it was that that convinced the magistrate judge to appoint counsel for her. She was in a very difficult position. And I think whether we can read her testimony as disavowing or not disavowing is going to turn on her credibility and turn on a jury's view of the very complicated position she was in as a witness in this case. So if I understand what you're saying, if a witness is coerced into giving testimony X, the fact that they don't disavow it later is neither here nor there because they face severe civil and criminal problems if they do disavow. So the real question is whether there was coercion. I think the real question is, Your Honor, I think that's a good point. The real question is whether there was coercion. And I think there's plenty of evidence that there was coercion. But I think that this witness communicated as best she could that she didn't know these people. She didn't even mention picking up friends until the September 2, 2011, coercive interview with McCarthy. And I think under the circumstances, under these complicated circumstances, this tightrope... Well, I don't see how you have a case on this point. If the mere fact that she was inconsistent or that her testimony changed, if it was not coerced, so what? That happens all the time. Witnesses have renewed, refreshed recollections. And if every time there was inconsistent testimony, that was a basis for a lawsuit against the prosecutors or the detectives, virtually no case would escape that rule. So it's got to be that you have, in your view, shown that there was coerced testimony. Yeah. The fact that she was inconsistent in terms of what she said happened on the night of the murder and didn't, until September 2, even come close to admitting anything related to picking up friends and dropping them on Denny Street until that was fed to her, suggests that the inconsistency was brought about by coercive means. And I think that's reflected in other cases like Blake v. Rays, where we're talking about an inconsistency and there's evidence that the inconsistency was brought about by undue pressure and that the information was not available to her until it was fed to her. She didn't say, okay, okay, I took two friends, until they said, isn't it true? And I would ask the court to take another look at the McCarthy interview notes, which practically read like a transcript, I think it's JA 1380 and 1381, where he says, I said, isn't it true? I'm paraphrasing, but isn't it true that you took Mike Thorpe and Mike Durand and Tony Lalonde to Denny Street? That was his introduction. That wasn't her introduction. And the case law, as I read it, says, that's not okay. That's coercion. That's presumption. It's fabricated evidence. Even if we concluded that the Mashaw testimony was coerced, we have an unprompted statement from Gardner, who has a shady history and I understand there were concerns about his credibility, but from the perspective of whether that's sufficient to establish probable cause, and whether there's grounds for rebutting that, why isn't that alone enough to knock out the claim? Your Honor, I think what the case law shows us is that when you've got, when you have to make a probable cause determination about a non-party's information, you go back to the original formula of saying, what would a person of reasonable caution taking into account any issues with veracity make, would it be reasonable for them to warrant a probable cause determination? Victor Gardner had veracity issues in the extreme. He was a career criminal. He was a drug addict. He was a potential participant in this crime. He was looking at 80, 40 years for an unrelated burglary. Pieces of the information that he gave were demonstrably false. And you can see in Mangan Yellow that when you've got an informant that's got veracity problems, and they're known to have given you information that is false, that can lead to rebutting the presumption. I also want to say that we don't know exactly what the circumstances were with the interview of Gardner because there was no effort to video or audio tape it. And, you know, plaintiff's police practices expert in his unrefuted testimony said that was a gross departure from ordinary police practice not to have a major witness in a murder case videotaped. So we don't know what they said. We do know that there's evidence that McCarthy showed Gardner's statement and articulated information from it in order to suggest to Meysha what she should say. We also know there's evidence that McCarthy did the same thing when it came to interviewing Gardner's wife in terms of what he wanted her to say. We also know that McCarthy's credibility is in real question. His felony, which we don't need to go into, but not only is it a felony, but there's a lying component in the crime. He was, you know, dispersing lewd pictures of a child using a fake name. And that was contemporaneous in time with his career as a police officer. So how did that shake out? We also know that Gardner made a deal with the officers at the time that he did. He was desperately trying to avoid prison. That's what the testimony says. That he would wear a wire and that they would let him go free. They wouldn't take him to county jail that night, which was the plan. And he agreed to do that. And then he didn't follow through with that. So, and then the fact that I hope this wasn't lost, but the climax of Gardner's statement is that he went to spend the night with the neighbors across the hall from Thorpe and Durand and got this confession from Thorpe on the night of the incident. And that's demonstrably false. He says, after he saw the police leave, he went to the friend's apartment, he went over to Thorpe, he got this confession, he went back and retired for the evening, he went back the next morning and got more of these confessions. Well, we know that after the police left, Thorpe went with them. And Thorpe was at the precinct until 5.15am. He couldn't possibly have gone there that night and gotten a confession from Thorpe. The police didn't even get there until 2.30am the next morning. So, the fact that you've got demonstrably falsehoods and other improbabilities in what he's saying, there are problems with this statement. And I would also point out that, you know, if it was such a great statement, an arrest would have been made immediately. They waited 15 months and they assembled a grand jury. You know, we look at cases like Frost, the New York City Police Department, Jovanovic, the city of New York. That wait, that wait is viewed by courts as evidence that there's something wrong with this statement and there's something wrong with the arrest. I don't understand. You've said two different things that seem to me inconsistent. First, you say that they relied at trial and in the grand jury and so forth on someone who, in your view, was a known liar and so forth, Mr. Gardner. And what they should have done is first sought corroboration. Now you're arguing that when this known liar made a statement, they should have gone out and immediately arrested instead of taking the time to seek corroboration. I don't understand how those two fit. I'm not saying they should have. They shouldn't have because there were major veracity issues and there were demonstrable falsehoods contained in the statement and there were all kinds of motivations to lie. And he was a known liar. So therefore, they should have sought corroboration, which is what they did. Absolutely. No, they did not. They did. You know, and again. Well, they did. You just don't like the form it took, which was the statement of this other witness. Yes, Samantha Mayshaw. There were other obvious leads, most notably the Michael Lone, which again, plaintiffs unrefuted police practices experts said it was a gross deviation from minimal police practices not to talk to him. There were references to Michael Lone making phone calls with the perpetrators. There were no efforts to get his phone records, there was no effort to talk to Michael Lone, he would have been the obvious person to talk to that evidences, a doubt, as well as the extreme gap in time before they move forward with this case, real doubt regarding the veracity of Gardner and the truth of his statements, and also a total disinterest of malice in what the truth was, you know, to focus on Mayshaw, who, you know, didn't know anything. And for all intents and purposes, you know was perhaps not even a competent witness with other issues to do that and to clearly introduce the information to her before she introduced it is is enough for a jury to look at this and say look this was coerced this was a coerced false statement. Thank you, Mr Hoffman. You've reserved some time for rebuttal. Thank you. We'll hear from a police. Mr Young's. You're muted. Can't hear you. You're muted. The mute button. The mute icon is not on but we can't hear you. There's no audio, we can see your lips moving. You might. You might take off your headset and see if you can get a. Can you hear me now Your Honor. Yes. Okay. Apologies, despite all the checks wasn't working. May it please the court, Jim Young's of Hancock Estabrook on behalf of that believes to va and Nissan the prosecutors in this case, I intend to focus primarily on prosecutorial immunity, of course, open to any questions on any issue from the court. All of the activity relied upon to assert a 1983 claim against the prosecutors all squarely within the prosecutorial function, and therefore the lower court appropriately applied absolute immunity to bar the claims here. The appellants focus on three acts by Ada Nissen that they claim give rise to liability and I'll briefly address each. First, the, they identify this pre grand jury meeting between Ada Nissen and witness Samantha Shaw. At that meeting, Nissen was preparing Samantha Shaw for possible testimony before grand jury assessing her story, evaluating that potential evidence. And in fact did indicate to her that there were some questions whether she would be treated as a defendant, on the one hand, or if she was willing to testify and simply tell the truth before the grand jury that by operation of law, she would be immune from prosecution. All of those activities of we see from across a broad cross section of cases cited on our brief falls within the basic prosecutorial function deciding whether or not to press charges, assessing witness credibility evaluating the case, preparing for grand jury anything attendant to presentation of evidence at grand jury or trial is a prosecutorial function. The second fact that they point to is generally state witness Victor Gardner has been discussed and the appellants, make much of the general on trustworthiness and Victor Gardner and and engage in Monday morning quarterback and want to retry this case and they don't. And in taking attack to avoid the absolute nature of that immunity the plaintiffs now say well, the ADA entered an agreement with Mr Gardner for plea on other issues, and that that constitutes somehow coercion. I'll point the court to to a case that didn't make it into the briefs Taylor versus Kavanaugh 640 F second for 50 from this court 1981 that identifies that add conduct in connection with plea bargaining negotiations giving deals as it were, is protected by absolute prosecutorial immunity. And finally, your honors. The question of this statement or characterization of evidence by Ada Nissen before grand jury. Again, we're operating in a world, essentially any activity that is a prosecutor's activity connected with or leading to grand jury is subject to immunity, and this is no different. And we see for the first time in reply. Now the appellant saying that Miss Nissen's characterization of the evidence was testimonial and Judge Rakoff identified this issue very clearly. That was not testimonial evidence. The ADA was characterizing an exhibit, she had presented to the grand jurors for the review that exhibit was a one page DNA report and that's at page 1618 of the joint appendix, it's a simple narrative statement, identifying what the DNA analysis found. And that was what the court, excuse me, that's what the grand jurors were looking at. And to suggest that a clue essentially closing statement or instruction from the assistant district attorney at the grand jury was testimonial in nature. It's not supported by any authority whatsoever and it simply doesn't hold any water as a factual matter. So, so Your Honors, unless you have any questions as to any aspect of the prosecutor's defense, I would simply rest and ask that the court affirm summary judgment in my client's favor. Thank you. Ms. Klusik. Good morning, Your Honors. May it please the court. Jenna Klusik, I'm here today on behalf of Appalachian Westcott, McCarthy and Lang. I have co-counsel, Mr. Paul Mullen is in appearance also. Briefly, I'd like to address the plaintiff's arguments with respect to Ms. Mashaw. I think this court's case law, specifically the Sednova case, very clearly establishes that there was no coercion here. In that case, the panel of this court that decided that said that in order to prove coercion, a plaintiff has to allege more than that the witness was told they were a suspect. It was a suggestion that it would be to their benefit to cooperate or that they were promised leniency for cooperation. And in this case, Ms. Mashaw specifically testified at her deposition that she was not forced by the Ogdensburg Police Department to do or say anything that wasn't true. And that's page 1465 of the joint appendix. The plaintiff has repeatedly said in their briefs and they've said today before the court that Ms. Mashaw was threatened with criminal prosecution if she didn't give them evidence that she didn't have. And the testimony that Ms. Mashaw gave at her deposition clearly and unequivocally establishes that that is not true. She was asked on page 1447 of the joint appendix, were you ever told that it was important to testify that you drove Anthony Lawn and his friends to Jean Lawton's house? No, they just said it was important that I tell the truth of what happened that night. They didn't say specifically that I had to say something specifically, just tell me what happened. I'm always a little bit struggled with what to do with that, because of course that's the appropriate thing to say. But coupled with, oh, by the way, here's Mr. Gardner's statement, here's what essentially what we believe happened. There can be positive consequences for you if you tell the truth. We've got the statement of what we believe happened. Doesn't that pretty much communicate that if the truth that she tells is anything other than corroborative of their statement, she's not going to have the benefit of the change in status from defendant to witness? Well, Your Honor, Ms. Mashaw was asked about that. She was asked whether the police ever told her that if she didn't give the correct account, there would be consequences. And she testified, no, they told me if I lied, but there's no correct, like it's either the truth or not the truth. And to take anything else from that testimony would be pure speculation and conjecture. I mean, that's her unequivocal testimony. And the plaintiff continues to argue that she was fed the names by Mr. McCarthy. And I think that if the court looks at the timeline of what happens, the third interview with Mr. McCarthy occurred on September 2nd. She met with the ADA and the investigator in June and then testified before the grand jury. And neither of those occasions did she use the word Mike's. So that completely undermines the plaintiff's argument that she was fed these names and then regurgitated them in order to get some sort of benefit. The key fact in these cases, as Your Honor pointed out, is typically a recantation or disavowal of prior testimony. That's what happened in the Blake case that the plaintiff relies on. The Zeri case, there were a number of factors that showed clear coercion. And one of them was that the plaintiff, the witness, suggested later on that he had lied. In this case, Ms. Masha specifically testified on pages 1446 and 1451 of the joint appendix that her testimony about the grand jury and the trial was truthful and complete. And for this court, with that testimony, to conclude that there's a genuine issue of material fact with respect to coercion, it would be pure speculation and pure conjecture. With respect to Mr. Gardner, Mr. Gardner gave a voluntary statement. This was not a case like Zeri, which I referred to earlier, where there were leading questions, there were suggestions made, there were, if you want this specific leniency, you're going to give me this specific testimony. He showed up and he made a voluntary statement. And I would note that with a few minor exceptions that we recognize in our brief, he gave the same story four times over a period of approximately eight years. At his deposition in facts, the grand jury, at the criminal trial, and then again when he was deposed in this case. The plaintiff talks about credibility issues and inconsistency issues with Mr. Gardner. The case law is abundantly clear, the Cologne case, the Gisconti case, that those are not sufficient to raise a tribal issue of fact with respect to overcoming the presumption. And the Augsburg Police Department did corroborate Victor Gardner's statement, not only through their conversations with Ms. Masha, but by going to his ex-wife, Brandi Gardner, and getting a statement from her. This substantially corroborated large parts of Mr. Gardner's testimony. And the plaintiffs, in their reply brief, they try to suggest that there's some sort of lack of clarity when Ms. McCarthy showed Brandi Gardner Victor's statement in relation to when she gave her own. And I would urge the court to look at that testimony very clearly. There is carefully, there is no ambiguity whatsoever. Ms. Gardner testified, page 1563 and 64 of the joint appendix, and then also in the record on pages 138 and 39 of her deposition testimony. Mr. McCarthy did not show her Victor Gardner's statement until after she had given her own. And if I may briefly, Your Honor, again, the plaintiffs are making arguments about Mike Lalonde. The police are under no obligation to pursue every lead that they have. And with respect to Detective Sergeant Layner, Lieutenant McCarthy, the plaintiff repeatedly keeps referring to his subsequent incarceration. This court has, on numerous occasions, said that you can't raise a genuine issue of material fact in opposition to a motion for summary judgment simply by throwing generalized character attacks and credibility attacks against a witness. I can defer to our brief for our arguments with respect to the alleged falsification of the phone. There are a number of arguments there, primarily that if Mr. Thorpe can't remember what he said, he can't claim that he was mischaracterized. And also our argument that any liability that the Augsburg Police Department defendants have here was cut off by the independent review that the district attorney did of the evidence in this case, and the independent decision that the district attorney's office made to present this case to the grand jury. Thank you, counsel. Mr. Hoffman, you preserve three minutes for rebuttal. Can you hear me? Yes. Hi, thank you. Yeah, with respect to the chain of causation argument, I think this court in Zari v. Coffey made pretty clear that if a law enforcement officer advances false information that somebody makes an independent, that's in quotes by the court, a determination about in the prosecutor's office that doesn't leave them free of culpability. And in the unusual case, the court also said in that case, when a prosecutor in their investigative capacity then uses the information in their prosecutorial capacity, that doesn't insulate them either. I would say that with respect to the phone, it's unfortunate that defendants continue to repeat this, that he couldn't remember because his deposition testimony, he did remember. He said it didn't come up in the first interview, and that was corroborated by Officer Lang, who said it didn't come up. So to continue hitting that and saying that's dispositive is puzzling to me. Maisha's testimony, if you look at it, I would really just refer the court to the briefing, was all over the map. And so to take one piece of it that favors the other side and isolate it or cherry pick it doesn't give you a full picture of what she was saying. I would just really urge the court to carefully look at all the briefing on what she said and to bear in mind that she said they came into her house without permission or authority and knocked on her bedroom door. And also the peculiar position she was in that she didn't want to lose her immunity for the murder, but she didn't want to perjure herself in this case that makes this case very unusual and makes her word come down to her credibility, which is for a jury. The Gisondi case is interesting that counsel cited. Gisondi is a court of appeals case where there was a complainant who had a good physical description of the perpetrator, his car, and so on and so forth. And there was an application made for an arrest warrant based on that. And, you know, the court said, look, and the defendant had an alibi. And they didn't mention that in the application for the warrant. And the court said, look, that doesn't rise to perjury or fraud in getting the warrant because there was enough there really for probable cause. But then they said in the exceptional case where during the heart of the complaint upon conduct, a defendant is in the precinct and the police know it, that would be extraordinary. And you'd have to tell that to the court. And if you didn't, it would be fraud or perjury. Well, guess what? The Gardner's both said on the night of the incident, Victor Gardner, as soon as the police left, went and got all these confessions. Brandy Gardner, in fact, said he went back and forth all night. When we know that as soon as the police left, Gardner was at, I'm sorry, when the police left, Thorpe was at the precinct. Just as, as the extreme example given in Gizondi. And officers knew that or definitely had reason to know that. Brandy Gardner, I would just repeat. The time has expired. If you want to quickly wrap up, you can do that. Yes, I just I'm on my last points. Thank you, Your Honor. Brandy Gardner, there is evidence that she was shown the statement by McCarthy that her husband made. And also it contained the same falsehoods about the interview or the Thorpe confession on the night of the incident. And finally, you know, with alone. There is. Yeah, I know there's a line of cases that says you don't have to pursue every lead, but those cases like Gizondi and like Burgess v. Joseph that that is also cited by defendants always have probable cause. And, and the mere discrepancies are things like, well, you know, he's a couple inches shorter or a couple inches larger or in the in the Burgess case they talk about his apparel and was it this shade of orange or that shade of orange. We're not talking about that. We're talking about material, a material witness who was with Gardner every step of the way in his story, who no effort was made to interview. With that, I'll rely on our submissions and I thank you very much for this experience. Thank you. Thank you, counsel will take the case under advisement. The last case on the calendar for today is on submission 10 versus Stony Brook. Number 20 4250 so that includes concludes our arguments for today. And I'll ask the court room deputy to adjourn. Or sense of john. Thank you. I'll transfer you now. Thank you. Thank you.